**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Mt. Hawley Insurance Co., an Illinois Corporation,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Total Building Systems, Inc., an Arizona Corporation,<br><br>　　　　Defendant. | No. CV-06-2473-PCT-NVW<br><br>**ORDER** |

　　　　Before the court are Plaintiff Mt. Hawley Insurance Co.'s ("Mt. Hawley") Motion for Summary Judgment (Doc. # 92), Defendant Total Building Systems, Inc.'s ("Total Building") Motion for Summary Judgment (Doc. # 100), and the related responses and replies.

**I.　　Statement of the case**

　　　　Mt. Hawley issued an insurance policy providing commercial general liability coverage to Total Building for the Hyatt Pinion Pointe Project (the "Project"). HTS-CHS Sedona, LLC, hired Linthicum Constructors, Inc. to build the Project, and Linthicum contracted with Total Building for the drywall work. Total Building subcontracted that work to Paul Johnson Drywall.

　　　　In February 2006, Linthicum sued HTS-CHS Sedona in state court for failing to pay amounts owed under their contract. HTS-CHS Sedona counter-claimed for

1 construction defects. Linthicum then filed a third-party action which named Total
2 Building and Paul Johnson Drywall as third-party defendants. Mt. Hawley is currently
3 defending Total Building under a reservation of rights in the state court litigation.

4       Mt. Hawley filed this action for a declaration of its obligations under the insurance
5 policy. Mt. Hawley asserts that Total Building is not entitled to coverage for the claims
6 asserted by Linthicum because Total Building breached the terms and conditions of the
7 insurance policy. Additionally, Mt. Hawley seeks rescission of the policy for
8 misrepresentation or mutual mistake about the nature of the Project.

## II. Background

10       On October 24, 2002, Linthicum, the general contractor on the Project, contracted
11 with Paul Johnson Drywall to act as the drywall subcontractor.[1] (PSOF ¶ 25.) However,
12 Paul Johnson Drywall could not obtain the insurance and bonding coverage required
13 under the contract. On February 25, 2003, Total Building and Paul Johnson Drywall
14 proposed to Linthicum that Total Building be given the drywall contract. They also
15 represented to Linthicum that although Total Building would provide bonding and
16 insurance for the Project, Paul Johnson Drywall would remain responsible for material
17 deliveries, production responsibility, accounts receivable, and contract administration.

---

[1] In its Objection to Plaintiff Mt. Hawley's Statement of Facts in Support of its Motion for Summary Judgment (Doc. # 116), Total Building objects to this fact as "immaterial." Local Rule LRCiv 56.1(b) mandates that for each paragraph of the moving party's statement of facts, the nonmoving party's controverting statement of facts must indicate whether the party disputes the fact set forth in that paragraph. If disputed, the nonmoving party must refer to specific admissible evidence in the record that supports its position. LRCiv 56.1(b). If not "specifically controverted" in this manner, the fact "shall . . . be admitted for purposes of the motion for summary judgment." *Id.*

      Total Building's objection that a fact is "immaterial" neither admits nor disputes the fact. Even were this construed as a denial of the fact, it would still run afoul of LRCiv 56.1(b) because it fails to provide any evidentiary reference. Therefore, this fact and the many others that Total Building failed to contravene by citation to the record are deemed admitted for purposes of the motion for summary judgment.

1  (PSOF ¶ 32.)  Total Building and Paul Johnson Drywall memorialized this arrangement in
2  a contract dated March 21, 2003.  (PSOF ¶ 31.)
3        On April 11, 2003, Total Building entered into a subcontract with Linthicum for
4  the drywall work on the Project.  (PSOF ¶ 30.)  Linthicum required that all subcontractors
5  secure liability insurance with a waiver of subrogation, but Total Building's insurance
6  carrier declined such insurance.  (PSOF ¶ 4.)  In response, Larry Prichard, Total
7  Building's president, asked his insurance agent, Mr. Christensen, to get the insurance.
8  (PSOF ¶ 10.)  Mr. Christensen shopped surplus lines brokers[2] and submitted Total
9  Building's request for the special coverage to Alder-Downey, a licenced surplus lines
10 broker.  (DSOF ¶ 18.)
11       Alder-Downey placed Total Building's request with Mt. Hawley and issued a
12 binder of coverage.  Mt. Hawley then issued a project specific commercial general
13 liability insurance policy to Total Building with a coverage period of April 24, 2003,
14 through April 24, 2004.  (PSOF ¶ 1.)  Although Total Building purchased the policy in its
15 name, the president of Paul Johnson Drywall testified that his company reimbursed the
16 cost of the premium.  (PSOF ¶ 39.)  In the underlying action, Total Building alleges that it
17 "did not perform any of the actual construction on the project, nor did it provide any
18 materials.  Paul Johnson performed all construction, fabrication, installation and finishing
19 work during the original construction of the project." (PSOF ¶ 33.)  In this action, Total
20 Building offers no evidence to contradict the assertion that Paul Johnson Drywall
21 performed all of the work at issue.
22       **A.**    **The conditions of coverage for work performed by subcontractors.**
23       As requested, the policy included an endorsement titled "Waiver of Transfer of
24 Rights of Recovery Against Others to Us" which waived Mt. Hawley's right to
25 subrogation.  (Doc. # 92, Ex. 1 at 23.)  Without more, this would have gravely expanded

---

[2]"Surplus lines" insurance products are those products that are "not readily procurable" from insurers authorized to offer insurance by the State of Arizona. *See* A.R.S. § 20-409(a).

- 3 -

the risk to Mt. Hawley, insuring the liability incurred not just by its investigated customer Total Building, but also by any subcontractor of Total Building. However, a separate endorsement voided any coverage for liability caused by subcontractors unless those subcontractors fully insured their work and indemnified Mt. Hawley. That endorsement, titled "CONTRACTORS-CONDITIONS OF COVERAGE", states:

> **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**
>
> **CONTRACTORS – CONDITIONS OF COVERAGE**
>
> It is hereby understood and agreed that conditions of coverage under this policy are:
>
> 1. Insured will obtain certificates of insurance with limits of liability equal to or greater than those provided by this policy from all subcontractors prior to commencement of any work performed for the insured.
>
> 2. Insured will confirm that the subcontractors' insurance policies are valid and have not been cancelled prior to commencement of any work by the subcontractors performed for the insured.
>
> 3. Insured will obtain hold harmless agreement from subcontractors indemnifying against all losses from the work performed for the insured by any and all subcontractors.
>
> 4. Insured will be named as additional insured on all subcontractors' general liability policies.
>
> 5. Insured will give notice of claim to all "potential insurers" within 30-days of giving notice of claim to us.
>
> "Potential insurers" means all insurance companies who may be obligated to defend the insured as either a named insured or an additional insured. "Potential insurers" includes the insurer of all subcontractors who were contractually obligated to name the insured as an additional insured on their own insurance policy(ies).
>
> In the event the insured fails to comply with the above conditions for a subcontractor whose work directly or indirectly gives rise to a claim, coverage for such claim will be voided under this policy. Insured agrees that we need not demonstrate any prejudice to us in order to enforce these conditions of coverage.
>
> Nothing herein contained shall be held to vary, alter, waive or extend any of the terms of the conditions, provisions, agreements or limitations of the above mentioned policy, other than as above stated.

(Doc. # 92, Ex. 1 at 33.) An insured's compliance with these conditions ensures that any claim arising out of its subcontractor's work that might otherwise expose the insurer to a loss will be indemnified instead by the subcontractor's own carrier. Therefore, this

- 4 -

1 additional endorsement effectively limited the scope of Mt. Hawley's exposure to those
2 claims arising out of work performed by Total Building, the entity it agreed to insure.

3       Shortly after the policy took effect, Mt. Hawley hired an independent surveyor to
4 conduct an audit of Total Building.  That audit revealed that Total Building had occasion
5 to hire subcontractors but did not incorporate a hold harmless agreement clause in its
6 contracts.  (PSOF ¶ 48.)  In response, Mt. Hawley sent correspondence to Alder-Downey
7 stating that if Total Building was using subcontractors on the Project, then "we need
8 verification that they receive hold harmless agreements from all subs."  (Doc. # 92. Ex.
9 28.)  Alder-Downey forwarded that inquiry to Total Building's retail agent Mr.
10 Christensen, who sent the message on to Total Building.  Mr. Christensen suggested that
11 if they were using a subcontractor they execute the standard hold harmless agreement he
12 attached to his correspondence.  (PSOF ¶¶ 49-51.)  Total Building sent Mr. Christensen's
13 fax on to Paul Johnson Drywall, but neither company ever responded to the inquiry or
14 produced an executed hold harmless agreement.  (DSOF ¶ 39.)

15       Total Building does not deny that it subcontracted the drywall work on the Project
16 to Paul Johnson Drywall.  It also admits that it never obtained certificates of insurance
17 from its subcontractor, that it has not produced a hold harmless agreement, and that it was
18 not listed as an additional insured on any insurance policy issued to Paul Johnson
19 Drywall.  Mt. Hawley asserts that Total Building's failure to comply with these three
20 conditions voids coverage for all claims arising from work performed by Paul Johnson
21 Drywall.  Total Building argues that its failure to comply with the conditions in the
22 endorsement should not result in a loss of coverage because it was not aware of its
23 obligation under the policy and the provision denying coverage is inconsistent with its
24 reasonable expectations as an insured.  Total Building also asserts that because Mt.
25 Hawley failed to follow up on its post-audit request for verification of a hold harmless
26 agreement and then took no adverse underwriting action after it received no response,
27 Total Building was induced to believe that the policy would cover all work on the project,
28 even work excluded from coverage.

**B.     The exclusion for residential developments.**

A separate endorsement in the policy excludes residential developments from coverage. That endorsement, titled "EXCLUSION - RESIDENTIAL DEVELOPMENTS AND CONDOMINIUMS," states:

> **THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY**
>
> **E X C L U S I O N – R E S I D E N T I A L DEVELOPMENTS & CONDOMINIUMS**
>
> The following exclusion is added to Coverage A., B, and C (Section I):
>
> This insurance does not apply, and we are not obligated to defend any loss, claim, "suit" or other proceeding for "bodily injury," "property damage," "personal injury," "advertising injury," or medical payments arising from "your work" on or "your products" used in "residential developments."
>
> As used in this endorsement:
>
> "Residential developments" includes but is not limited to single and multi-family dwellings (including condominiums), coach houses, driveways, retaining walls, detached garages, sewer and water lines, parking lots, fences, swimming pools, grading of lots, and landscaping.
>
> Exceptions:
>
> We will cover claims arising from "your work" or "your product" in the following circumstances:
>
> (1)   "Your work" is performed on, or "your product" is used in, an individual, detached home, which received municipal or governmental certification of occupancy for no more than one family prior to the commencement of "your work" or installation of "your product," and no more than 50% of the original square footage of that individual dwelling or its improvements is replaced in the course of the project involving "your work" or use of "your product" or;
>
> (2)   "Your work" is performed on or "your" product" used in apartments. Apartments does not include condominiums or town houses that have been converted into rental units or are rented to others, nor does it include apartment buildings or complexes if they have been converted into condominium or co-operatives.

(Doc. # 92, Ex. 1 at 42.)

When Total Building asked Mr. Christensen to secure an appropriate insurance policy, it described the Project as a hotel. (PSOF ¶ 12.) Mr. Christensen in turn communicated to Alder-Downey that the Project was the Hyatt Hotel in Sedona, Arizona. (PSOF ¶ 16.) In fact, the "hotel" is a timeshare resort "in the condominium form of

- 6 -

ownership." (Doc. # 92, Ex. 5 at 336.) Mt. Hawley claims that it does not issue construction coverage for timeshares, condominiums, or residential projects. It further asserts that the Hyatt Pinion Pointe Project falls within the policy's definition of a "residential project" and is therefore excluded from coverage. Total Building points out, however, that the residential exclusion in the policy makes no mention of "timeshares." Moreover, the individual units cannot legally be treated as residences and therefore Total Building argues that, even if one considers them to be condominiums, they are not truly "residential" units.

Finally, Mt. Hawley argues that it is entitled to either statutory or common law rescission of the insurance contract because it would not have issued the policy had it known the true nature of the Project. Total Building asserts that there is no basis for rescission of the policy because the Project operates, at least in some respects, like a hotel.

### III.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the pleadings, depositions, affidavits, answers to interrogatories, and admissions on file show that there is no genuine dispute regarding the material facts of the case and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c) (2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (citations omitted). The court must evaluate a party's motion for summary judgment construing the alleged facts with all reasonable inferences favoring the nonmoving party. *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1117 (9th Cir. 2001).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). Where the moving party has met its initial burden with a properly supported motion, the

1  party opposing the motion "may not rest upon the mere allegations or denials of his
2  pleading, but . . . must set forth specific facts showing that there is a genuine issue for
3  trial." *Anderson*, 477 U.S. at 248 (citations omitted). Summary judgment is appropriate
4  against a party who "fails to make a showing sufficient to establish the existence of an
5  element essential to that party's case, and on which that party will bear the burden of
6  proof at trial." *Celotex Corp.*, 477 U.S. at 322; *accord Citadel Holding Corp. v. Roven*,
7  26 F.3d 960, 964 (9th Cir. 1994). Although the initial burden is on the movant to show
8  the absence of a genuine issue of material fact, this burden may be discharged by
9  indicating to the Court that there is an absence of evidence to support the nonmoving
10 party's claims. *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315 (9th Cir.
11 1995).

## IV. Legal Analysis

"[T]he interpretation of an insurance contract, including whether its terms are ambiguous or uncertain, is a question of law for the court to decide." *Thomas v. Liberty Mut. Ins. Co.*, 173 Ariz. 322, 324, 842 P.2d 1335, 1337 (Ct. App. 1992) (citations omitted). The court will "read the policy as a whole to give a reasonable and harmonious meaning and effect to all of its provisions." *Associated Aviation Underwriters v. Wood,* 209 Ariz. 137, 158, 98 P.3d 572, 593 (Ct. App. 2004) (citation and internal quotation omitted).

### A. Claims arising from work performed by Paul Johnson Drywall are not covered under the policy because Total Building failed to comply with the contractor's conditions of coverage.

Total Building does not dispute that it violated the express terms of the policy. Instead, it argues that it was not aware that a violation of the conditions would void coverage for any claim arising out of work performed by its subcontractor. However, Total Building's ignorance can only be attributed to its own negligence. The policy language is unambiguous; the third page of the policy states "Contractors -Conditions of Coverage"; the conditions are found in a stand alone endorsement that states "CONTRACTORS - CONDITIONS OF COVERAGE" in large, bold letters; and the face

- 8 -

1  of the binder says the endorsement relates to contractors and "Required HH & AI Status
2  from Subs." (DSOF, Ex. 1.) Total Building, an experienced business organization, could
3  have understood the terms of the contract —had it taken the time to read it. *See Darner*
4  *Motor Sales, Inc. v. Universal Underwriters Ins. Co.*, 140 Ariz. 383, 395, 682 P.2d 388,
5  400 (1984) (contemplating that under some circumstances an insured has a duty to read
6  his policy).

7  Nevertheless, even where an insured fails to read the unambiguous terms of his
8  policy, he may, under certain circumstances, escape the consequences of those terms if
9  they run contrary to the reasonable expectations of the average insured. The "reasonable
10 expectations doctrine" protects parties to standardized insurance contracts against
11 overreaching by "hold[ing] the drafter to good faith and terms which are conscionable."
12 *Darner*, 140 Ariz. at 394, 682 P.2d at 399. In accordance with "[t]he general rule of
13 contract interpretations" endorsed by the Restatement (Second) of Contracts and the late
14 Arthur L. Corbin, "boilerplate terms which are contrary to either the expressed agreement
15 or the purpose of the transaction as known to the contracting parties" are not given effect.
16 *Id.* Therefore, this consumer-protection doctrine, "essentially a relaxation of the rule
17 barring parol evidence from being admitted to discern the intent of the parties to the
18 contract," can "override even unambiguous contract provisions when an insured
19 reasonably expected the provision to operate differently." *Vencor Inc. v. Nat'l States Ins.*
20 *Co.*, 303 F.3d 1024, 1035 (9th Cir. 2002) (citing *Gordinier v. Aetna Cas. & Sur. Co.*, 154
21 Ariz. 266, 272, 742 P.2d 277, 283 (1987)).

22 The reasonable expectations concept must, however, "be limited by something
23 more than the fervent hope usually engendered by loss." *Darner*, 140 Ariz. at 390, 682
24 P.2d at 395. Thus, "[w]hen an exclusion, limitation, or escape clause runs contrary to
25 what a reasonable insured would expect, or when it significantly diminishes coverage that
26 the policy purports on its face to provide, the surrounding facts and circumstances must
27 be considered to determine whether, and to what extent, there was a meeting of the minds
28 between the contracting parties." *Phila. Indem. Ins. Co. v. Barerra*, 200 Ariz. 9, 17, 21

P.3d 395, 403 (2001); *see also Gordinier*, 154 Ariz. at 272, 742 P.2d at 283 (the reasonable expectations doctrine is designed to protect against terms "which are contrary to either the expressed agreement or the purpose of the transaction as known to the contracting parties").

### 1. Total Building's purported belief that it could get insurance based upon its own worthiness and then pass it on secretly to a subcontractor was not objectively reasonable.

Total Building asserts that it is entitled to the benefit of the reasonable expectations doctrine. However, Total Building's alleged belief that the policy provided coverage for claims arising from work performed by anyone other than its own employees was not objectively reasonable under the circumstances surrounding the formation of the insurance contract. Total Building knew that the type of coverage it needed for the Project was so risky for an insurer that it could only obtain it in the surplus lines insurance market. A waiver of subrogation eliminates an insurer's recovery from third parties for claims arising out of its insured's operations. Therefore, who an insurer contracts to insure, and the type of work they perform, are essential to the nature of the risk the insurer agrees to take. Total Building knew that Paul Johnson Drywall could not get such insurance.

Total Building intended from the beginning to serve as a front for Paul Johnson Drywall's insurance needs, but the parties to the contract never negotiated for Mt. Hawley to take on that risk. It would offend the very essence of the transaction if Total Building could, without notice to its insurer, unilaterally expand the benefit of insurance and the waiver of subrogation to its own subcontractor. The purpose of the contractor's conditions of coverage is to ensure that when Mt. Hawley underwrites a risk, it is not coerced into providing coverage for an entity it never contracted to insure. Mt. Hawley assumed a high amount of risk when it agreed to waive its right to subrogation for the customer it knew, and it was not reasonable for Total Building to think that its secret status as Paul Johnson Drywall's strawman extended the benefit of that contract to an entity unknown to the insurer.

- 10 -

### 2. The contractor's conditions of coverage neither emasculate apparent coverage nor eliminate the dominate purpose of the agreement.

Total Building also argues that the contractor's conditions of coverage defeat reasonable expectations because they take away coverage on the face of the policy and eliminate the dominant purpose of the agreement. Total Building does not, however, point to any term in the policy that is inconsistent with the endorsement at issue. Moreover, the dominant purpose of the agreement was to provide Total Building with a commercial general liability policy, waiving subrogation, that extends to derivative liability for subcontractors' work only if the full risk of that derivative liability is eliminated by the subcontractors' own insurance and indemnifications. The purpose of the agreement was for the insurer to take on the risk of liability from Total Building's work, but not ultimately from its subcontractors' work. Endorsements voiding such derivative liability unless the subcontractors maintain their own insurance, execute a hold harmless agreement, and designate the insured as an additional insured on their own policies "are nonstandard but not unusual" under such circumstances. *Scottsdale Ins. Co. v. Essex Ins. Co.*, 98 Cal. App. 4th 86, 94, 119 Cal. Rptr. 2d 62, 69 (2002); *see also* 1 SCOTT C. TURNER, INSURANCE COVERAGE OF CONSTRUCTION DISPUTES § 41:1 (2d ed. 2007).

### 3. Mt. Hawley is not estopped from denying coverage for claims in the underlying lawsuit because it made no promise or assurance of coverage contrary to the terms of the policy.

Total Building argues that Mt. Hawley should be estopped from denying coverage for the claims in the underlying lawsuit because it learned that Total Building may have been using subcontractors on the Project but did not inform Total Building how that might affect its coverage. Total Building asserts that Mt. Hawley's failure to take any underwriting action after it received no response to its post-audit inquiry induced Total Building to believe that it continued to have coverage for the Project.

Total Building's argument is meritless. First, Total Building's violation of the contractor's conditions did not void all coverage under the policy. The endorsement

- 11 -

1 states, "In the event the insured fails to comply with the above conditions for a
2 subcontractor whose work directly or indirectly gives rise to a claim, *coverage for such*
3 *claim* will be voided under this policy." (Doc. # 92, Ex. 1 at 33, emphasis added.)  The
4 conditions void coverage only for claims arising from the work of a subcontractor who
5 has not provided the requisite protections.  Even after Total Building violated the
6 conditions in the endorsement, the policy continued to cover any work Total Building
7 performed itself.  Mt. Hawley was not obligated to take action following the audit
8 because the work performed by Total Building —the only entity whose work Mt. Hawley
9 agreed to insure with separate protections— was still covered under the policy.  At that
10 time only Total Building was in a position to know that it did not actually perform any
11 work on the Project.

12      Next, before acceptance of the reasonable expectations doctrine, Arizona followed
13 the majority rule that "the doctrines of waiver and estoppel are not available to bring
14 within the coverage of an insurance policy risks not covered by its terms, or expressly
15 excluded therefrom."  *Darner*, 140 Ariz. at 394-95, 682 P.2d at 399-400.  The reasonable
16 expectations doctrine changed that rule only to the extent that an insured can now rely on
17 an expectation of coverage as long as his belief is induced by a promise or assurance from
18 the insurer which is contrary to the express terms of the policy.  *See id.*, at 395-96, 682
19 P.2d at 400-01; *DeTemple v. Southern Ins. Co.*, 154 Ariz. 79, 87, 740 P.2d 500, 508 (Ct.
20 App. 1987).

21      Although Mt. Hawley discovered that Total Building may have been using
22 subcontractors on the Project, it made no promise or assurance whatsoever concerning the
23 coverage of their work.   Mt. Hawley never induced Total Building to believe anything
24 contrary to what was said plainly in the insurance contract.  Indeed, the audit, performed
25 solely for the benefit of Mt. Hawley, afforded Total Building another chance to protect
26 itself from its own subcontractor.  Total Building offers no evidence that it was
27 affirmatively induced to form an expectation of coverage contrary to the express terms of
28 the policy and, therefore, its estoppel argument must fail.

### 4. Total Building's violation of the contractor's conditions of coverage prejudiced Mt. Hawley.

Finally, Total Building argues the exclusion should not be enforced because Mt. Hawley was not prejudiced by non-compliance with the contractor's conditions of coverage. The policy states, however, that Mt. Hawley "need not demonstrate any prejudice" in order to enforce the contractor's conditions of coverage. (Doc. # 92, Ex. 1 at 33.)

Moreover, it is clear beyond dispute that Mt. Hawley was prejudiced by Total Building's failure to meet the policy conditions. If the endorsement were voided, Mt. Hawley would bear a duty to defend and a duty to indemnify on alleged construction defects created by an entity it never intended to insure and explicitly excluded from coverage. Had Total Building required Paul Johnson Drywall to name it as an additional insured on its own policy or to give a hold harmless assurance, Paul Johnson's carrier would owe policy obligations to Total Building as an additional insured.

Total Building's assertion that Mt. Hawley has suffered only theoretical prejudice because the underlying lawsuit has not yet been resolved in Linthicum's favor is plainly false. Mt. Hawley alone is paying to defend the underlying action, not the missing insurer for Paul Johnson Drywall. Thus, Mt. Hawley has been harmed and suffered actual prejudice. Mt. Hawley's motion for summary judgment will be granted to the extent it seeks a declaratory judgment that the policy does not provide coverage for any claims arising from work performed on the Project by Paul Johnson Drywall.

### B. The Residential Exclusion does not bar coverage for work performed by Total Building because the Project is not residential.

Mt. Hawley asserts that the policy's exclusion of residential developments excludes coverage for all claims arising out of the Project. Total Building argues that the Project is not a "residential" development and that there is no exclusion for timeshares as such.

Mt. Hawley's exclusion does not define "residential developments." Rather, it states, "'Residential developments' includes, but is not limited to single and multi-family

- 13 -

1 dwellings (including condominiums), coach houses, driveways, retaining walls, detached
2 garages, sewer and water lines, parking lots, fences, swimming pools, grading of lots, and
3 landscaping." (Doc. # 92, Ex. 1 at 42.) This "definition" merely gives examples of
4 excluded construction projects. Although the term "condominium" is used in the title of
5 the endorsement, the operative language of the exclusion does not purport categorically to
6 deny coverage for all condominium developments, only those that are "residential."

7 At best there is ambiguity, and ambiguity must be construed in favor of the
8 insured. *See Security Ins. Co. of Hartford v. Andersen*, 158 Ariz. 426, 428, 763 P.2d 246,
9 248 (1988) ("Where ambiguity in an insurance contract exists, the policy will be
10 construed against the insurer. This is especially true where the ambiguity involves an
11 exclusionary clause.") (citations omitted). Therefore, the relevant question is not whether
12 the units in the Project are owned in condominium form, but whether the development is
13 residential or commercial in nature.

14 The timeshare units at the Hyatt Pinion Pointe Project are not "residential" under
15 the ordinary meaning of the word. *See Mission Ins. Co. v. Nethers*, 119 Ariz. 405, 408,
16 581 P.2d 250, 253 (Ct. App. 1978) ("[E]xclusions in an insurance contract must be
17 construed in a reasonable manner and giving ordinary meaning and effect to the terms
18 used therein.") The parties do not dispute that the "owners"of the units purchase a
19 timeshare interest that grants them an undivided one-fifty-first interest in a specific unit.
20 (DSOF ¶ 66.) Upon the purchase of this interest they become a Hyatt Vacation Club
21 member with their "home resort" designated as the Hyatt Pinion Pointe. However, the
22 "member" can use that interest at any of several other Hyatt Vacation Resorts. (DSOF ¶
23 65.) Members must compete with other members to use their interest in the property by
24 making a reservation on a first-come, first-served basis. (DSOF ¶ 67.) Most importantly,
25 although members have a property interest in a particular unit, they are only permitted to
26 use the facility as a "vacation accommodation" for "recreational uses," and the use may
27 not extend past the one week reservation period. (Doc. # 92, Ex. 5 at 31.) Additionally,
28 the deed restrictions prohibit any person from staying in a unit with the intent that it

become a principal dwelling or to establish a legal domicile in the State of Arizona. (*Id.* at 33.)

Given the restrictions on the use of the units, the nature of the ownership interests, and the consequence of ambiguity in the insurance contract, the Project is not a residential development within the meaning of the policy exclusion. Rather, it is a diffusely owned commercial vacation facility and investment vehicle. The "owners" of the units do not purchase a "residence"'; they enter into a vacation buying and investment venture. Although the recorded form of ownership is "condominium," condominiums can be either commercial or residential in character. The development here is functionally similar to a commercial hotel resort. The plain language of the policy excludes residential developments, and the use of the term "condominium" cannot be taken out of that context. The exclusion must be construed in favor of coverage.

**C.    Mt. Hawley is not entitled to statutory or common law rescission of the policy.**

Mt. Hawley seeks rescission of the Policy because the formation of the contract was the result of a mutual mistake or material misrepresentation. Although Mt. Hawley might argue that the contract should fail as a result of Total Building's concealment of its status as Paul Johnson Drywall's front man, it has not sought relief on that ground. Instead, Mt. Hawley asserts that Total Building either mistakenly or negligently represented that the Project was a hotel, a representation that materially affects the basis of the contract.

Under the common law of Arizona "a contract may be rescinded when there is a mutual mistake of material fact which constitutes an essential part and condition of the contract." *Renner v. Kehl*, 150 Ariz. 94, 97, 722 P.2d 262, 266 (1985); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 152 (1981). Similarly, an insurer may rescind based upon misrepresentations, omissions, concealment of facts, or incorrect statements in the insurance application when they are: 1) fraudulent; 2) material either to the acceptance of the risk, or the hazard assumed by the insurer; and 3) the insurer in good

- 15 -

faith either would not have issued the policy, or would not have issued the policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application or otherwise. A.R.S. § 20-1109.

Mt. Hawley asserts that the representation of the Project as a hotel is material to the insurance contract because the policy only insures non-residential construction projects. (Doc. # 92 at 17:9-10.) As discussed above, however, the Project is non-residential. There is no categorical exclusion of properties held in condominium form of ownership, only those that are residential. Although Mt. Hawley argues that it "does not insurer (sic) condominium and/or timeshare projects," by the terms of its policy it did here. Therefore, Mt. Hawley is not entitled to common law or statutory rescission on the ground that it did not mean to insure what its policy does insure.

### D. Mt. Hawley will be awarded its attorney's fees under A.R.S. § 12-341.01(A).

Mt. Hawley seeks an award of its attorney's fees. A federal court sitting in diversity applies state law in deciding whether to allow attorney's fees when those fees are connected to the substance of the case. *Price v. Seydel*, 961 F.2d 1470, 1475 (9th Cir. 1992); *Shakey's, Inc. v. Covalt*, 704 F.2d 426, 435 (9th Cir. 1983). "In any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees." A.R.S. § 12-341.01(A). The trial court has discretion in awarding attorneys' fees and can consider, among other factors:

> 1) the merits of the unsuccessful party's claim,
> 2) whether the successful party's efforts were completely superfluous in achieving the ultimate result;
> 3) whether assessing fees against the unsuccessful party would cause extreme hardship,
> 4) whether the successful party prevailed with respect to all relief sought,
> 5) whether the legal question presented was novel or had been previously adjudicated, and
> 6) whether a fee award would discourage other parties with tenable claims from litigating.

*Assoc. Indemn. Corp. v. Warner*, 143 Ariz. 567, 570, 694 P.2d 1181, 1184 (1987); *see Valarde v. PACE Membership Warehouse, Inc.*, 105 F.3d 1313, 1319-20 (9th Cir. 1997)

- 16 -

(applying the factors).  No single factor need be determinative, and the court is to weigh all of the factors in exercising its discretion.  *Wilcox v. Waldman*, 154 Ariz. 532, 538, 744 P.2d 444, 450 (Ariz. App. 1987).

Here Mt. Hawley has obtained the entire practical relief it seeks in this action —a declaration that it need not defend the underlying suit to the extent it is based on the work of Total Building's subcontractors, which is all the work that matters in the underlying action.  "[W]here a party has accomplished the result sought in the litigation, fees should be awarded for time spent even on unsuccessful legal theories."  *Orfaly v. Tucson Symphony Soc'y*, 209 Ariz. 260, 266, 99 P.3d 1030, 1036 (Ct. App. 2004) (quoting *Schweiger v. China Doll Rest., Inc.*, 138 Ariz. 183, 189, 673 P.2d 927, 933 (Ct. App. 1983)).  Mt. Hawley has not succeeded in rescinding the policy, but that was an alternate strategy and would add nothing to its success in avoiding a duty to defend and a duty to indemnify in the underlying action.

Moreover, the policy itself was born of deception.  Total Building and Paul Johnson schemed for insurance protecting Total Building in name, but insuring the uninsurable Paul Johnson in fact.  It did not occur to them that sensible insurers would write their policies to prevent such abuse, and they did not bother to read the policy they got.  Total Building has fought this action to salvage through the courts the scam against which Mt. Hawley plainly and properly protected itself.  All the factors, especially this one, favor a full award to Mt. Hawley of attorney's fees in this action.  Mt. Hawley should claim its attorney's fees in accordance with the procedures of Fed. R. Civ. P. 54(d)(2) and LRCiv 54.2.

IT IS THEREFORE ORDERED that Plaintiff Mt. Hawley Insurance Co.'s Motion for Summary Judgment (Doc. # 92) is GRANTED only to the extent that it seeks a declaration that it owes no defense or indemnification under the CONTRACTORS - CONDITIONS OF COVERAGE endorsement.  The Motion is otherwise DENIED.

IT IS FURTHER ORDERED that Defendant Total Building Systems, Inc.'s Motion for Summary Judgment (Doc. # 100) is GRANTED to the extent that it seeks to avoid denial of coverage under the RESIDENTIAL DEVELOPMENT & CONDOMINIUM exclusion and rejection of Plaintiff's request for rescission of the insurance policy. The Motion is otherwise DENIED.

IT IS FURTHER ORDERED that, upon entry of the declaratory judgment filed herewith, the Clerk shall terminate this action.

DATED this 14th day of July, 2008.

Neil V. Wake
United States District Judge